IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TIM JON SEMMERLING, | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) Case No. |
| | ) Judge |
| CHERYL T. BORMANN; | ) |
| UNITED STATES OF AMERICA | ) |
|     Defendants. | |

**COMPLAINT AT LAW**

NOW COMES the Plaintiff, TIM JON SEMMERLING (SEMMERLING), by his attorneys, LAW OFFICES OF RAYMOND G. WIGELL, LTD, and presents its Complaint at Law and in support thereof, complains as follows:

**NATURE OF THE ACTION**

1. This is an action under the Federal Tort Claims Act (FTCA) under 28 USC § 1346(b) against Defendants: United States of America regarding it's employees: Michael Schwartz, Brigadier General John G. Baker, Major Matthew H. Seeger, and Edwin Perry which applies Illinois common law of negligence and common law tort of Intentional Infliction of Emotional Distress to provide appropriate relief to TIM JON SEMMERLING (SEMMERLING) who was subjected to negligent and intentional conduct committed by the United States Defendants who were employed by the Department of Defense which resulted in termination of his employment with the Department of Defense, Office of Military Commissions and has had a negative impact upon his mitigation services practice.

2. This is also an action under Illinois common-law as it relates to Defendant, Cheryl T. Bormann which applies Illinois common law of Defamation, Negligence and Intentional Infliction of Emotional Distress to provide appropriate relief to TIM JON

1

SEMMERLING (SEMMERLING) who was subjected to negligent and intentional conduct committed by the Defendant BORMANN, who was an independent contractor and not an employee of the Department of Defense (Thus, not subject to the FTCA), which resulted in termination of his employment with the Department of Defense, Office of Military Commissions and has had a negative impact upon his mitigation services practice.

## PROCEDURAL HISTORY

3. Plaintiffs, SEMMERLING, and The Mercury Endeavor originally filed this cause of action on April 21, 2017 under case number 1:17-cv-03021 in the Northern District of Illinois.

4. The case was then assigned to Judge Robert Gettleman.

5. All Defendants filed a motion to dismiss in regards to SEMMERLING's original complaint.

6. On February 21, 2018, Judge Gettleman dismissed the original complaint without prejudice. The basis for the dismissal was that SEMMERLING failed to exhaust his administrative remedies by failing to submit an administrative claim to the Department of Defense prior to filing the original complaint.

7. Judge Gettleman's order of dismissal also further stated that SEMMERLING was able to submit a timely administrative claim under the Savings Provision of FTCA (28 USC 2679 (d)(5) within 60 days to the appropriate Government Agency (Department of Defense).

8. On April 4, 2018, SEMMERLING through his attorneys, the Law Offices of Raymond G. Wigell, Ltd, submitted the administrative claim via Standard Form 95 on April 4, 2018.

9. It was received by the Department of Defense on April 5, 2018 via USPS overnight mail.

10. On July 12, 2018, the Department of the Army denied SEMMERLING's Administrative claim, thus allowing SEMMERLING to re-file this cause of action in Federal Court.

11. Judge Gettleman was made aware of the denial of the FTCA claim on August 29, 2018. On the same date, the Plaintiff voluntarily dismissed all pending complaints.

## PARTIES TO ACTION

12. At all relevant times, Plaintiff, SEMMERLING, was a citizen of the State of Texas. SEMMERLING has worked and practiced his mitigation services in Illinois since 2010 and plans to remain working and practicing in Illinois. SEMMERLING is also domiciled in Illinois.

13. At all relevant times, Cheryl T. Bormann (BORMANN), is a citizen of Illinois and is a death-penalty, qualified lead counsel attorney, licensed in Illinois hired by the Department of Defense, Office of Military Commissions and the Military Commissions Defense Organization as an independent contractor.

14. At all relevant times, Michael A. Schwartz (SCHWARTZ), is a citizen of Washington D.C. and is an attorney licensed in Illinois, was a Captain and Major for the USAF, and was acting as an attorney on assignment at the Military Commissions Defense Organization.

15. At all relevant times, Brigadier General John Baker, USMC (BAKER) is a citizen of Washington D.C. and is Chief Defense Counsel with the Military Commission Defense Organization.

16. At all relevant times, Major Matthew H. Seeger (SEEGER) is a citizen of Washington D.C. and is an attorney with the U.S. Army on assignment at the Military Commissions Defense Organization.

17. At all relevant times, Edwin A. Perry (PERRY) is a citizen of Washington D.C. and is an attorney with the Military Commissions Defense Organization.

**JURISDICTION AND VENUE**

18. Jurisdiction of this court is invoked pursuant to the FTCA as to SCHWARTZ, BAKER, SEEGER and PERRY as they were employees of the Department of Defense when these causes of action were committed. The FTCA waives the United States' sovereign immunity from tort suits. Levin v. United States, 133 S. Ct. 1224, 1228, 185 L. Ed. 2d 343 (2013). Moreover, the FTCA gives federal courts exclusive jurisdiction over civil actions against the United States for property loss or injury, personal injury, or death that is caused by the negligent or wrongful act of a governmental employee acting within the scope of his employment or action. 28 U.S.C. § 1346(b)(1). Id.

19. Venue is proper pursuant to 28 U.S.C. § 1402 under the FTCA as the plaintiff, SEMMERLING resides in the Northern District of Illinois.

20. Venue is proper pursuant to 735 ILCS 5/2-101 as Defendant BORMANN'S principal office is located in Cook County, Illinois and upon information and belief, BORMANN is also a resident of Cook County.

21. No real property is involved in this cause of action.

22. SEMMERLING has been injured by the Defendants' conduct and has suffered damages resulting therefrom.

**STATEMENT OF FACTS**

23. SEMMERLING holds a PhD from Indiana University in Near East Languages and Cultures (Arabic and Hebrew). He holds a Juris Doctorate from DePaul University College of Law, and he is licensed as an attorney in Illinois.

24. SEMMERLING is a principal in The Mercury Endeavor, LLC, a mitigation firm founded in 2010 in the State of Illinois, and which promotes its expertise and experience of working with Arabs, Muslims, and the military.

25. From June 10, 2011 to October 23, 2015, SEMMERLING worked as the mitigation specialist for a male enemy combatant (CLIENT herein) at the Military Commissions in Guantanamo Bay, Cuba. He worked as a contractor under the umbrella of The Military Commission Defense Organization (formerly the Office of Chief Defense Counsel)-Office of the Military Commissions.

26. On June 10, 2011, BORMANN contacted SEMMERLING by telephone to say she was a defense attorney for an enemy combatant, who claimed membership in al-Qaeda and was being charged for the crimes of 9/11, and she wanted to hire SEMMERLING as the mitigation specialist for the enemy combatant. She told SEMMERLING not to accept any offer from any other defense team.

27. On October 18, 2011, SEMMERLING began working as the mitigation specialist with his first trip to Washington, D.C., for a meeting with BORMANN and the capital defense team.

28. On July 9, 2012, SEMMERLING traveled to Washington, D.C., for an interview with Central Intelligence Agency (CIA) security agents to gain his TS/SCI[1] clearance. In preparation for the CIA interview, SEMMERLING was instructed by BORMANN and SCHWARTZ to be honest with the interviewers, and there would be nothing to worry about. They also informed him that following the successful completion of the interview, SEMMERLING would be required to take a polygraph test administered by the CIA.

29. On July 10, 2012, Agent D (female) and Agent DJ (male) interviewed SEMMERLING from approximately 0800-1200. During the interview, they inquired into his life, including his activities in the Palestinian Territories and Israel and his sexuality. Following the honesty rule set down by BORMANN and SCHWARTZ, he told the CIA interviewers that he was homosexual and about his current long-term relationship.

---

[1] Top Secret/Sensitive Compartmented Information

30. Agent D asked how SEMMERLING could assure them that no foreign agent or government could use this information against him to blackmail him for classified information. SEMMERLING told them that he was in a committed relationship, and he never mixed his sexual relations with work.

31. Agent D questioned SEMMERLING further about his sexual activities. SEMMERLING told her that he was in the Middle East to conduct academic research and never did nor would not have compromised the validity of his research.

32. Agent D and Agent DJ reminded SEMMERLING of the responsibility he would have to ensure that his sexuality would not compromise his mission or foster vulnerability to blackmail.

33. On July 11, 2012, SEMMERLING took a polygraph test with CIA Agent M. After the test, CIA Agent DJ appeared in the waiting room and told SEMMERLING that he had passed the test.

34. On October 3, 2012, SEMMERLING traveled to Washington, D.C., to receive his "read-on" (or also known as "read into"[2]) for his TS/SCI clearance. He received his security clearance on October 4, 2012.

35. On October 9, 2012, SEMMERLING traveled for the first time to Guantanamo Bay, Cuba (GTMO) and met CLIENT, an enemy combatant claiming membership in al-Qaeda. SEMMERLING met with CLIENT numerous times.

36. BORMANN knew of SEMMERLING'S homosexuality since July 9, 2012. Between October 9, 2012 and January 9, 2014, BORMANN had been to SEMMERLING'S home

---

[2] The process of being "read on" or also known as "read into" a compartmented program generally entails being approved for access to particularly sensitive and restricted information about a classified program, receiving a briefing about the program, and formally acknowledging the briefing, usually by signing a non-disclosure agreement describing restrictions on the handling and use of information concerning the program.

in Illinois on several occasions. Early on, she confirmed that SEMMERLING was homosexual by asking him if he was. SEMMERLING told her that he was homosexual and asked her if it was a problem. She told him that she was perfectly fine with it, and it was a secret that she would keep. She said that SCHWARTZ would be informed. She emphasized that CLIENT, an enemy combatant, claiming membership in al-Qaeda must never find out about SEMMERLING'S sexual orientation.

37. Around January 2013, SCHWARTZ, BORMANN, and SEMMERLING met. SCHWARTZ told SEMMERLING, in the presence of BORMANN, there are three things that a team member should never tell their CLIENT, if you wanted to stay on the team: (1) you are gay; (2) you served in Iraq and Afghanistan; and (3) you are Jewish. SCHWARTZ cited the fact that CLIENT was a member of al-Qaeda, and that CLIENT would not tolerate people on the team with these backgrounds.

38. Around 2012, BORMANN came to SEMMERLING and informed him that a mitigation specialist on another defense team told his client also a male enemy combatant client, who claimed membership in al-Qaeda, that he and his male domestic partner had adopted a child. That client was appalled to learn that the mitigation specialist was homosexual. The client demanded the immediate firing of the mitigation specialist, and refused to meet with the mitigation specialist ever again. BORMANN was concerned with this event and told SEMMERLING again that CLIENT could never find out that SEMMERLING is homosexual.

39. On January 9, 2014, LCDR James Hatcher (HATCHER) and SCHWARTZ traveled to Chicago for a meeting with BORMANN and SEMMERLING to interview a potential expert. BORMANN arranged for dinner at a Chicago steak house and invited SEMMERLING'S domestic partner, an adult male.

40. On January 10, 2014, BORMANN approached SEMMERLING and said that a potentially dangerous incident happened the night before. As HATCHER and SCHWARTZ were walking to their hotel after dinner, HATCHER asked SCHWARTZ if SEMMERLING was homosexual. SCHWARTZ informed BORMANN of the incident and told HATCHER that his question should be directed to SEMMERLING.

41. BORMANN told SEMMERLING that under no circumstances could he tell anyone on the defense team about his sexuality. She did not want CLIENT, to ever find out and use it against him as a reason to fire him. She told him that he was not allowed to tell HATCHER because HATCHER could tell the interpreter, Ali al-'Arashi (AL-ARASHI), who would certainly tell CLIENT.

42. From January 10, 2014 until October 2015, SEMMERLING, consistent with BORMANN and SCHWARTZ'S instructions, did not discuss his sexuality with anyone on the team. He did mention his domestic partner with some individuals on the team as his business partner and co-founder of the mitigation firm. No one from the defense team ever asked SEMMERLING if he was homosexual or spoke to him about being homosexual other than BORMANN and SCHWARTZ.

43. Around February 2014, BORMANN hired an expert who is openly homosexual. She told SEMMERLING that he must never be exposed to the client as homosexual or he would surely be fired.

44. On September 14-15, 2015, BORMANN, SCHWARTZ, SEEGER, PERRY, and SEMMERLING interviewed several potential experts that were homosexual. BORMANN stated that it did not matter if the potential experts were homosexual, because CLIENT would never meet these experts.

45. Between October 23, 2013 and October 22, 2015, Khalid Sheikh Mohammad (MOHAMMAD), an enemy combatant claiming membership in al-Qaeda and charged

with crimes of 9/11, and SEMMERLING interacted. MOHAMMAD asked SEMMERLING questions about his personal life. SEMMERLING kept true to his commitment to the defense team and the instructions given to him by BORMANN and SCHWARTZ by not revealing his sexual orientation.

46. On May 14, 2014, SEMMERLING hosted a conference meeting at his home for the defense team. The event was known as "Camp Khallad." Prior to the event, BORMANN was worried about having the conference at SEMMERLING'S home because the defense team members would pose questions about his domestic partner. SEMMERLING told her that he would put all his photographs away and asked his domestic partner to leave the house. She said those ideas gave her relief because she did not want defense team members to know about SEMMERLING'S sexuality and possibly say something, even if innocently, to CLIENT.

47. On October 23, 2015, BAKER ordered SEMMERLING to a meeting. When SEMMERLING came, BAKER was not present. Only BORMANN and SCHWARTZ were present. BORMANN and SCHWARTZ ordered SEMMERLING to leave GTMO. BORMANN stated that BAKER asked them to do so.

48. After SEMMERLING'S departure from GTMO, he received communications from several team members that BORMANN, SCHWARTZ, BAKER, PERRY and SEGER embarked on a "character assassination" of SEMMERLING and his work, although SEMMERLING did not receive specifics.

49. On April 28 2016, SEMMERLING learned that defense attorneys BORMANN, SCHWARTZ, SEEGER, and PERRY had a meeting with the defense team after SEMMERLING'S departure from GTMO. BORMANN told them that she and SCHWARTZ informed CLIENT that SEMMERLING is homosexual. BORMANN with SCHWARTZ present told the defense team that SEMMERLING:

9

    a. Was infatuated with CLIENT and

    b. He was pursuing a homosexual interest with CLIENT.

50. SEMMERLING'S termination was wrongful. CLIENT told SCHWARTZ on October 22, 2015, that SEMMERLING was a responsible team member and was the only one on the team that completed the work that he asked to be accomplished. SCHWARTZ said that SEMMERLING was endangering CLIENT'S life. CLIENT was appalled and said that SEMMERLING was saving his life. CLIENT told SCHWARTZ that no one was to touch SEMMERLING, stating, "Tim now reports to me. No one else." Furthermore, SEMMERLING has since learned CLIENT informed BAKER and the judge in the Military Commissions that SEMMERLING performed his job well and in the interests of his death-penalty client, but BORMANN, SCHWARTZ, BAKER, PERRY AND SEEGER terminated SEMMERLING based on their personal vendetta harbored against him.

51. Since June 17, 2016, SEMMERLING has learned that BORMANN, SCHWARTZ, BAKER, PERRY, AND SEEGER'S "character assassination" on SEMMERLING further includes statements that SEMMERLING'S lifestyle was a threat to CLIENT; has a "pathological and self-serving streak in management of relationships with high profile terrorism defendants," and it is their objective to ensure SEMMERLING never works on a capital or military defense team again.

52. Public record of proceedings shows CLIENT has repeatedly requested BORMANN, SCHWARTZ, SEEGER and PERRY to be removed as his attorneys.

53. Nothing contained in this complaint deals with privileged communication between attorney and client because this complaint deals with matters outside the scope of representation, thus the absolute privilege does not apply.

**COUNT I – DEFAMATION PER SE AS TO DEFENDANT CHERYL T. BORMANN**

54. Plaintiff repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one (1) through fifty-three (53) as though fully set forth herein.

55. Count I applies to Defendant, Cheryl T. BORMANN, only.

56. "Illinois recognizes five categories of statements that are considered defamatory per se, including those statements:

    a. that impute the commission of a criminal offense;

    b. that impute infection with a loathsome communicable disease;

    c. that impute an inability to perform or a want of integrity in the discharge of duties of office or employment.

    d. that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business; or

    e. that impute adultery or fornication." Kenneth T. Lumb, Ch. 3, Defamation, Intentional Torts (IICLE®, 2014 § 3.7) Fried v. Jacobson, 99 Ill.2d 24, 457 N.E.2d 392, 394, 75 Ill.Dec. 398 (1983); Bryson v. News America Publications, Inc., 174 Ill.2d 77, 672 N.E.2d 1207, 220 Ill.Dec. 195 (1996).

57. Plaintiff alleges that Defendant's defamatory statements fall under two categories of Defamation Per Se. (See (c) and (d) in paragraph 47 above).

58. Specifically, Defendant's defamatory statements fall under the following categories:

    a. (c). That impute of an inability to perform or a want of integrity in the discharge of duties of office or employment and

    b. (d). that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business. Fried v. Jacobson, 99 Ill.2d 24, 457 N.E.2d 392, 394, 75 Ill.Dec. 398 (1983); Bryson v. News America Publications, Inc., 174 Ill.2d 77, 672 N.E.2d 1207, 220 Ill.Dec. 195 (1996).

11

59. Defendant, BORMANN made at least two oral statements to CLIENT that SEMMERLING as a homosexual male:

    i. was infatuated with CLIENT and
    ii. he was pursuing a homosexual interest with CLIENT.

60. BORMANN and others informed defense team members of said defamatory statements.

61. BORMANN knew the statements were false or recklessly disregarded their falsity.

62. The statements made to CLIENT and to other members of the defense team were false. SEMMERLING did not have an infatuation with CLIENT nor was he sexually attracted to CLIENT. Furthermore, he was not pursuing a homosexual interest with CLIENT.

63. The statements clearly referred to SEMMERLING, and the Defendant specifically identified SEMMERLING by name and referred to him by name. CLIENT understood that the statements were of and concerning SEMMERLING. Defendant (BORMAN and others) made these statements to other persons.

64. The statements were orally communicated directly to CLIENT and other members of the defense team by Defendant BORMANN and others. CLIENT and the other members of the defense team are not plaintiffs and are third parties.

65. The false statements have caused harm to SEMMERLING'S professional reputation and has deterred other government agencies from hiring SEMMERLING as a mitigation specialist, expert and lawyer.

66. The defamatory statements impute SEMMERLING'S inability to perform the duties for the Department of Defense, Office of Military Commissions, and the Military Commissions Defense Organization, as a mitigation specialist because of his sexual orientation and that he was pursuing a homosexual interest with CLIENT as opposed to doing the work of an effective and professional mitigation specialist.

67. On information and belief, on or before October 23, 2015, BAKER was informed by BORMANN that SEMMERLING as a homosexual male:

    a. was infatuated with Client and

    b. he was pursuing a homosexual interest with CLIENT.

68. BAKER ordered SEMMERLING to a meeting with him at his office knowing that BORMANN and SCHWARTZ would terminate SEMMERLING. BAKER deliberately did not attend said meeting.

69. When the defamatory statements about SEMMERLING became generally known to the CLIENT's defense team and to the GTMO capital defense community, BAKER'S focus was an investigation of the leak of information not on the veracity of the defamatory statements. BAKER knew or should have known that the statements were false. Based on his position as Chief Defense Counsel with the Military Commissions Defense Organization and the investigative focus he initiated, he further published the defamatory statements.

70. The defamatory statements also impute that SEMMERLING lacked the ability in his profession as a mitigation specialist. Defendant BORMANN made false statements that SEMMERLING'S work product was poor and that he was not a team player.

71. SEMMERLING sustained special harm as a result of the publication of the false and defamatory communication by Defendants, including but not limited to, the loss of his professional reputation.

**COUNT II-DEFAMATION PER QUOD AS TO DEFENDANT CHERYL T. BORMANN**

72. Plaintiff repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one (1) through fifty-three (53) as though fully set forth herein.

73. Count II applies to Defendant, Cheryl T. BORMANN, only.

74. SEMMERLING'S claim also falls within Defamation Per Quod.

75. A cause of action for defamation per quod may be brought in two circumstances:

    a. The defamatory character of the statement is not apparent on its face; extrinsic circumstances must be used to determine its injurious meaning. b.

    b. A statement is defamatory on its face, but does not fall into one of the categories actionable per se. See Bryson, supra, 672 N.E.2d at 1214 – 1215.

76. Defendant BORMANN made at least two oral statements to CLIENT that SEMMERLING as a homosexual male:

    a. was infatuated with CLIENT and

    b. he was pursuing a homosexual interest with CLIENT.

77. BORMANN and others informed defense team members of said defamatory statements.

78. The statements made to CLIENT were false. SEMMERLING did not have an infatuation with CLIENT nor was he sexually attracted to CLIENT. Furthermore, he was not pursuing a homosexual interest with CLIENT.

79. The statements clearly referred to SEMMERLING, and the Defendants specifically identified SEMMERLING by name and referred to him by name. CLIENT understood that the statements were of and concerning SEMMERLING. Defendants' (BORMANN and others) made these statements to other persons.

80. The statements were orally communicated directly to CLIENT by Defendant BORMANN and others. CLIENT is not a plaintiff and is a third party.

81. The false statements have caused harm to SEMMERLING'S reputation and has deterred other government agencies from hiring SEMMERLING as a mitigation specialist, expert and lawyer.

82. The oral defamatory statements made by BORMANN to CLIENT and further repeated to the defense team and others by BORMANN and others may not seem defamatory, but circumstances and context in this case establish the injurious meaning.

14

83. CLIENT is an enemy combatant and claims membership in al-Qaeda. His political, personal beliefs and religion strongly condemn homosexuality, and he would not tolerate a homosexual person as his mitigation specialist on his defense team.

84. BORMAN and others specifically instructed SEMMERLING to keep his sexual orientation a secret from CLIENT and all other members of the defense team.

85. Defendant's acts described herein were reckless, outrageous, willful, and malicious, and therefore warrant the imposition of punitive damages.

86. Plaintiff also suffered special damages as a result of this harm including, but not limited to, the loss of his professional reputation and fear of loss of his life.

87. Plaintiff has and will suffer special damages and pecuniary loss directly from a loss of clients in his mitigation practice and a loss of profit.

## COUNT III-NEGLIGENCE AS TO CHERYL T. BORMANN AND THE UNITED STATES OF AMERICA

88. Plaintiff repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one (1) through fifty-three (53) as though fully set forth herein.

89. Count III applies to Defendant Cheryl T. BORMANN and Defendant United States of America including its employees: BAKER, SCHWARTZ, PERRY and SEEGER.

90. Plaintiff also alleges negligence under the FTCA.

91. Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would

be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 USC § 1346(b)

92. In an action for negligence under Illinois law, a plaintiff must show "that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." First Springfield Bank & Trust v. Galman, 188 Ill. 2d 252, 720 N.E.2d 1068, 1071, 242 Ill. Dec. 113 (Ill. 1999) (citation omitted). Proximate cause under Illinois law consists of cause in fact and legal cause. Palay v. United States, 349 F.3d 418, 432 (7th Cir. 2003) (citation omitted). Cause in fact requires that the injury would not have occurred absent defendant's conduct (i.e. when defendant's conduct is a "substantial factor" in bringing about the injury), and legal cause relates to foreseeability. *Id*.

93. Defendants owed a duty to SEMMERLING. Defendant's had a duty to protect SEMMERLING.

94. Defendants were aware of SEMMERLING'S sexual orientation. The Defendants were also aware of CLIENT's hatred of homosexuals. CLIENT is said to be a member of al- Qaeda. Al- Qaeda have no tolerance for homosexual and their religious beliefs condemn homosexuality. Al-Qaeda routinely committed acts of violence against homosexuals.

95. The Defendants were aware of CLIENT's and al- Qaeda's religious beliefs and views on homosexuality. They were also aware that al-Qaeda routinely committed acts of violence against homosexuals.

96. As part of the defense team, the team members owed a duty to protect one another from allowing sensitive information to be revealed to the CLIENT, an enemy combatant, that had the potential to be life threatening.

97. The defendants breached this duty by revealing the sensitive information that SEMMERLING was homosexual to the client knowing of his religious beliefs and views on homosexuality.

98. The causation of the breach resulted when SEMMERLING discovered that this incident occurred on April 28, 2016. SEMMERLING then since became physically and emotionally ill as a result of this discovery.

99. As a result of the Defendants' negligence, Plaintiff has incurred compensatory and punitive damages. This negligence has negatively impacted his career and mitigation firm. He has also suffered emotional damages a result.

### COUNT IV-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO ALL DEFENDANTS

100. Plaintiff repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one (1) through fifty-three (53) as though fully set forth herein.

101. Count IV applies to all Defendants.

102. The FTCA does cover claims of Intentional Infliction of Emotional Distress. Hatcher-Capers v. Haley, 762 F. Supp. 393 (D.D.C. 1991).

103. Under Illinois law, to succeed on a claim for intentional infliction of emotional distress, a plaintiff must prove that: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." Swearnigen-El v. Cook Cty. Sheriff's Dept., 602 F.3d 852, 864 (7th Cir. 2010).

104. Defendants' conduct is extreme and outrageous.

105. Defendants exposed SEMMERLING'S sexual orientation to CLIENT knowing CLIENT'S views on homosexuality.

106. Defendants recklessly disregarded the probability that the conduct would cause SEMMERLING emotional distress.

107. Defendants were well aware of CLIENT'S views on homosexuality and that al-Qaeda, to which he claims allegiance and membership, and his culture routinely commits acts of violence, including the death penalty against known homosexuals.

108. Learning of this fact caused SEMMERLING severe and extreme emotional distress. He became fearful for his physical well-being, his family and property.

109. Defendant's conduct actually and proximately caused SEMMERLING's emotional distress.

110. These statements along with the pertinent known background information cause SEMMERLING to fear for his life.

WHEREFORE, Plaintiff, TIM JON SEMMERLING demands:

A. Judgment against Defendant Cheryl T. BORMAN in the amount of equal to or greater than $26,000,000.00.

B. Judgment against the United States of America under the FTCA (28 USC § 2675b) in the amount of $26,000,000.00.

C. Demanding Judgement in his favor and against defendants jointly and severally for all monetary, legal and equitable relief available, including attorney's fees.

D. Any other equitable relief or remedies that the court deems just.

                                                  Respectfully Submitted,

                                                  /s/ Raymond G. Wigell
                                                  Law Offices of Raymond G. Wigell, Ltd.
                                                  Attorneys for Plaintiff

Law Offices of Raymond G. Wigell, Ltd.,
Raymond G. Wigell, #3013391
20280 Governors Highway, Suite 204
Olympia Fields, IL 60461
(708) 481-4800  Office
(708) 481-4848  Fax
rwigell@wcdchicago.com